***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Holmes and the briefs filed with the Full Commission. Both parties waived oral argument. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Holmes, with modifications.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties in their Pre-Trial Agreement which was filed on April 23, 2001 and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Employee is Turner Wiley.
2. The Employer is United Parcel Service, Inc.
3. The Carrier at risk is Liberty Mutual Insurance Company.
4. At all relevant times, United Parcel Service regularly employed three or more employees and was bound by the North Carolina Workers' Compensation Act and an and employer and employee relationship existed between the employer and the employee.
5. A Form 22 is stipulated by the parties.
6. The parties contend the issues to be heard are:
 a. Whether the plaintiff sustained a compensable injury by accident and/or occupational disease arising out of and in the course of employment pursuant to N.C. Gen. Stat. § 97-2 and/or N.C. Gen. Stat. § 97-53 on or about August 30, 2000, which resulted in a seizure.
 b. If so, to what wage and medical compensation is plaintiff entitled under the Act.
 ***********
Based upon all of the evidence and the reasonable inferences therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Jerry Ejindu, a part-time fueler with UPS out of the Greensboro Hub, was working the night of plaintiff's seizure. Ejindu works on the midnight shift from 1 a.m. to 5:30 a.m. Ejindu was not present when fuel began to be spilled. However, when he returned from washing a truck he saw fuel spilling down the drain and plaintiff in a "state of confusion." By that, Ejindu testified that he meant that the plaintiff did not know what to do then. Ejindu testified that it took him and plaintiff about 30 minutes to clean up the fuel that plaintiff spilled. When Ejindu first saw plaintiff after the fuel spill, plaintiff was running around trying to get something to stop the fuel from going down the drain.
2. Michael Cole was plaintiff's supervisor. Cole has been employed with UPS for about 15 years as a part-time supervisor. Cole's main job duties include training all of the fuelers as well as dealing with compliance issues. Cole testified regarding having trained plaintiff to perform the fueler position and to the fact that plaintiff performed the job in a full-time capacity.
3. Turner Wiley testified on his own behalf. He testified that he had a prior seizure condition. He explained that there were four fuel islands that were used to pump fuel into the trucks at the Greensboro Hub of UPS. These fuel islands were out in the open, and there was a building nearby where employees could keep soft drinks.
4. Plaintiff had made complaints to OSHA about possible fume exposure. OSHA's response to those complaints which was admitted into evidence as plaintiff's Exhibit No. 6 indicates that there were no detectable hazardous fumes to which the plaintiff or any other fueler could have been exposed. In October when OSHA came back to respond to plaintiff's complaint and actually hooked up the testing devices to plaintiff, again, there was no evidence that plaintiff was exposed to any detectable level of hazardous fumes.
5. Plaintiff described his pre-existing seizure condition as one which normally manifested itself with staring spells from between five to ten seconds. Plaintiff testified that he had a seizure on August 30, 2000, and when he next became aware of what was happening, there was fuel running out of the fuel tank, and he had the fuel wand in his hand.
Plaintiff admitted that neither Dr. Hill, Dr. Wittenburg nor Dr. Yuson have said that he could not return to work.
6. When asked by his attorney about any stressors going on at work, plaintiff testified that there were several things happening at work which made him unhappy. Plaintiff claimed that he was not provided with the same uniform and outerwear as other employees. He also indicated that he had several pay disputes with the company and felt that he did not always receive his vacation pay in a timely way. He also requested some shelter over the fuel pumps which apparently was not provided to him. He was also unhappy about the fact that someone in another job with UPS was allowed to skip his lunch and leave work an hour early. Plaintiff testified that he did not like to have to take his lunch hour when it was scheduled because he then had to go home to sleep when he was still full from lunch.
7. Plaintiff explained on cross-examination that his work area was quite large and outside. He indicated that he could be as far as 200 feet away from the fuel pumps and actually could be sitting in a package car or in a totally separate area as long as he could see the fuel pumps when the next truck came up.
Plaintiff explained that in any given hour of his eight-hour shift, there could be as few as 10 trucks to fuel or up to 20 trucks occasionally. Plaintiff testified that he really did not recall what happened in the early morning hours of the 30th, that all he remembered was that there was a fuel spill and that he was responsible for it.
8. Plaintiff confirmed that he was ready and willing to return to work for UPS. Plaintiff explained that he was currently suing UPS in Federal Court to either return him to work in the fueler position or in the small sort position. Plaintiff agreed that his medical condition and medical restrictions have not changed with respect to his seizure disorder since approximately 1988. Plaintiff confirmed that he was ready, willing and able to return to work within his restrictions. Plaintiff confirmed that his medical conditions do not prevent him from performing his regular job as a fueler with UPS.
9. Plaintiff also testified that he recalled settling numerous other workers' compensation claims against UPS and Liberty Mutual including those dated April 30, 1993; January 11, 1995, June 9, 1995, March 1985 and as well as two in 1996.
10. Mike Cole testified again briefly for the defense. Cole clarified that on average during an eight-hour shift, plaintiff would fuel between 40 and 50 trucks. It would take him approximately three to six minutes per truck to top off their fuel. Cole explained that on any given day, there could be as few as 30 trucks to fuel or as many as 70, but on average, it would be between 40 and 50 trucks.
11. Dr. Farah is a psychiatrist who saw plaintiff on two occasions. Plaintiff first saw Dr. Farah on or about February 1, 2000. Plaintiff reported stress and depression, multiple depressive symptoms including poor sleep, irritability, poor concentration and exacerbation in his seizure condition that he felt was due to stress. Plaintiff believed that he had been forced out of his job and that was what he pointed to as his main stressor.
12. Dr. Farah saw plaintiff next on or about March 27, 2000. Again, at this time, plaintiff complained of stress involving finances, and he told Dr. Farah he had an Industrial Commission hearing before the Deputy Commissioner coming up. Dr. Farah also testified that plaintiff complained to him of marital stress and sexual problems in his marriage. Dr. Farah testified that if plaintiff indicated that he wanted to go back to work, Dr. Farah would allow him to do that as long as he was satisfied that it was safe for him to do that given his underlying seizure condition. Dr. Farah could not answer any questions to any greater detail about that as he admitted that he really did not have enough information regarding plaintiff's underlying seizure disorder.
13. Dr. George Wittenburg is an assistant professor in the Department of Neurology at Wake Forest University School of Medicine. Dr. Wittenburg testified that he had a general neurology background. Dr. Wittenburg explained the basics of epilepsy and seizure disorders.
14. According to Dr. Wittenburg plaintiff suffers from Cryptogenic Epilepsy, cause unknown. Dr. Wittenburg explained that in most cases where people have seizure disorders like plaintiffs, seizures just come "out of the blue. They just occur." Two of the most common things which cause people with plaintiff's type of seizure disorder to have seizures is a low level of their anti-convulsants medication and a lack of sleep.
15. Dr. Wittenburg testified, and the Full Commission finds as fact, that there was nothing with respect to pumping diesel fuel or the smelling of diesel fumes which might contribute in any way to causing seizures like those experienced by plaintiff. However, it is possible that long-term exposure to high levels of fuel could be associated with Encephalopathy (brain damage) which could be associated with seizures. Dr. Wittenburg had previously testified that plaintiff had no abnormal findings and no indication of damage to his brain.
 Stress has also not been linked to triggering seizure disorders. Dr. Wittenburg rendered an opinion, which the Full Commission finds as fact, that pumping diesel fuel would not put plaintiff at a greater risk of having a breakthrough seizure than members of the public not so engaged.
16. Dr. Carlo P. Yuson, board certified in neurology, testified that the plaintiff apparently had a partial seizure with secondary generalization. Dr. Yuson explained that many of these episodes just happen, and he could not say what the cause of plaintiff's seizure disorder was.
17. Dr. Yuson rendered the opinion, which the Full Commission finds as fact, that pumping fuel did not put plaintiff at an increased risk for a breakthrough seizure nor did stress play a part in an increase in plaintiff's seizures.
18. According to Dr. Yuson, it was much more likely that plaintiff had missed medication or was suffering from a lack of sleep. There was no medical reason why plaintiff could not go back to work.
19. Dr. Edward Hill is a neurologist who has treated plaintiff for his underlying seizure disorder since 1996. Dr. Hill initially saw plaintiff respecting this claim on August 31, 2000 and returned him to work in the fueler position. Dr. Hill explained that anybody, even if they are compliant with their anti-convulsant mediation, is likely to have a breakthrough seizure. "They can have a break through seizure on an infrequent basis, no matter how compliant they are. There is no 100 percent guarantee." Dr. Hill returned plaintiff to work in the job of fueler after his September 14, 2000 visit. It was not until plaintiff came to see Dr. Hill on November 20, 2000 that Dr. Hill indicated that plaintiff should not return to the fueler job.
Dr. Hill explained that he offered this opinion because at some point in November, plaintiff decided that he thought the diesel fuel fumes were noxious and since plaintiff had changed his position on his ability to do the job, Dr. Hill just supported plaintiff. Dr. Hill testified that plaintiff was "absolutely" able to work.
21. Dr. Hill could not testify to a reasonable degree of medical certainty that any exposure plaintiff had to diesel fuel fumes in any way contributed to or exacerbated his underlying seizure condition. In summary, Dr. Hill testified that "I don't think I can answer with any degree of certainty." Whenever Dr. Hill would testify that he thought that it could be a possible cause of plaintiff's alleged seizure on August 30th, Dr. Hill always qualified that opinion with testimony indicating that he could not testify to a reasonable degree of medical certainty, and in fact, he testified that there could be numerous other causes for plaintiff's seizure. Dr. Hill explained that "You don't have to have a precipitating event."
22. Just as with the testimonies of Drs. Yuson and Wittenburg, Dr. Hill did not make any causal connection between plaintiff's seizure disorder and his job with UPS. In fact, Dr. Hill testified that it was possible that plaintiff did not even have a seizure on the day in question. Dr. Hill indicated that plaintiff even wondered "if he could have just dozed off."
23. Prior to working as a fueler for defendant, other than the initial seizure while driving a package car in 1985, and prior to the August 30, 2000, seizure, plaintiff's seizures were relatively well controlled by medication, and he had not otherwise had a seizure while at work.
24. Plaintiff's counsel submitted a lengthy "Brandeis" brief concerning the possible linkage of long-term exposure to diesel fuel and/or diesel exhaust and seizure disorder. While the information submitted indicated that there could be a possible link between exposure to diesel fuel and/or diesel exhaust and seizure disorder, there was no scientific testimony that this was what caused plaintiff's seizure on August 30, 2000. In fact, most of the testimony was to the effect that loss of sleep or failure to take seizure medication was most likely the cause.
24. Although a number of physicians said plaintiff could return to work, UPS declined to permit plaintiff to return, apparently fearful that another seizure while pumping diesel fuel could lead to far worse consequences. Plaintiff became depressed because of the consequences of not being permitted to return to work. However, plaintiff's inability to work at UPS was not because of his depression. Plaintiff's inability to work at UPS resulted from a business decision not to allow a person subject to seizures to pump diesel fuel. There was no evidence that plaintiff was unable to work at other jobs that did not require driving or fueling.
 ***********
Based upon the foregoing Findings of Fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff bears the burden of proving each element of compensability in order to prove his claim. Plaintiff has failed to prove that he sustained a compensable injury by accident arising out of and in the course and scope of his employment with UPS. Plaintiff has also failed to prove the existence of an occupational disease. N.C. Gen. Stat. § 97-2(6), N.C. Gen. Stat. § 97-53.
2. There is no evidence of record that plaintiff is disabled from working. N.C. Gen. Stat. § 97-2
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission makes the following:
 AWARD
1. Plaintiff's claim is, and under the law must be DENIED.
2. Defendants shall pay the costs, including an expert witness fee of $235.00 to Dr. Brian A. Farah and $275.00 to Dr. George Wittenberg, if these costs have not been paid.
This 11th day of July 2002.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER